**Doris Ann BOYD, Appellant,**

v.

**Walter E. BADENHAUSEN, Jr., M.D., Appellee.**

Supreme Court of Kentucky.

Oct. 7, 1977.

Alan N. Leibson, Kathleen Ogden Davis, Louisville, for appellant.

James G. Apple, Stites, McElwain & Fowler, Louisville, for appellee.

PALMORE, Justice.

Doris Ann Boyd appeals from a summary judgment dismissing her suit against Dr. Walter E. Badenhausen for damages occasioned by a delay between the time when she contends he should have performed surgery on her and the time he finally did do it. It is our opinion that the record before the trial court did not sufficiently negate the existence of a genuine issue of material fact to justify summary judgment. Cf. CR 56.03.

It was established by the pleadings that Dr. Badenhausen is an orthopedic surgeon and that Mrs. Boyd became his patient in February of 1973. The remaining factual information in the record consists of an affidavit filed in support of the summary judgment and the discovery depositions of Mrs. Boyd and Dr. Badenhausen. The trial court did not render a written opinion, and the judgment does not indicate the basis for its implicit conclusion that the defendant was entitled to a judgment as a matter of law.

In February of 1973 Mrs. Boyd was suffering pain and numbness in her right arm and wrist. She secured an appointment to see Dr. Badenhausen on February 19, 1973, but actually was seen by a Dr. Lang, an employe of the professional service corporation of which Dr. Badenhausen and two other physicians were the members. After preliminary tests proved negative, at a second visit on February 22, 1973, Dr. Lang

tentatively diagnosed her condition as a carpal tunnel syndrome, which frequently necessitates surgery, and had his nurse make an appointment for Mrs. Boyd with Dr. Thomas Kelley for further testing of a nature designed either to confirm or eliminate his initial diagnosis. At the conclusion of Mrs. Boyd's ensuing visit to Dr. Kelley's office she was advised that the results would be reported to Dr. Badenhausen and that she should call his office within the next few days.

Dr. Kelley's tests were conducted on May 29, 1973. Mrs. Boyd called Dr. Badenhausen's office about a week later and was told by one of the employes in the office that the report had not yet arrived. Some three days later she called again, at which time, she says, "the girl in Dr. Badenhausen's office told me to call Dr. Kelley's office and find out if, indeed, the report had been sent . . . I called Dr. Kelley's office and she said that it had gone out about a week before that and they should have gotten them . . ." After several telephone calls to Dr. Badenhausen's office Mrs. Boyd was told that the report still had not arrived but that when it was received, and if it was "positive," Dr. Badenhausen's office would telephone her.

To summarize the rest of Mrs. Boyd's version of the matter, she never did hear from Dr. Badenhausen's office, but because she had already made numerous telephone calls on her own initiative and was not being treated very courteously by the office help, and also because her symptoms became less aggravating as the summer wore on, she simply gave up and quit calling the doctor's office. All the while, however, it appears that the Badenhausen corporation did in fact have Dr. Kelley's report, which confirmed Dr. Lang's diagnosis, but had misplaced it in the files.

As cooler weather set in during the fall of 1973 Mrs. Boyd's symptoms gradually returned and became more pronounced, to the point that in February of 1974 her employer called her in and told her that it was impairing her work and he would have to give her the sack if she didn't get something done about it. These dismal tidings galvanized her into action again and she promptly reported to the emergency room of a local hospital. After examining Mrs. Boyd the physician on duty concluded that she should see another doctor, so on March 1, 1974, she went to Dr. Richard Roth. The information given to Dr. Roth by Mrs. Boyd led him to telephone Dr. Kelley's office and get the results of the report that had been sent to Dr. Badenhausen back in June of 1973. Dr. Roth then advised Mrs. Boyd to have surgery and to go back to Dr. Badenhausen for that purpose, which she did.

Mrs. Boyd succeeded in getting an appointment to see Dr. Badenhausen on March 7, 1974, at which time, she says, "they couldn't find my file, and finally after looking for it for a while they found it filed under the D's." Dr. Badenhausen then reviewed her record, put her arm in a "night splint," and arranged for surgery, which he performed on March 20, 1974.

The operation was entirely successful. Presumably Mrs. Boyd's damages consist mostly of the pain and suffering endured by her during the interval between June of 1973 and March of 1974, and from that standpoint the controversy may fall a trifle short of cataclysmic magnitude, but it does present one legal question of sufficient importance to justify this much discussion. The question is whether the veil of a professional service corporation protects its members from personal responsibility for the negligence of its corporate employes in doing or failing to do those things that are embraced in the duties owed by a physician to his patient. The answer is "No."

KRS 274.055 provides in substance that the corporate existence shall not affect the relationship between the professional member and his client or patient. Just as a surgeon is responsible for the negligence of a nurse or surgical attendant employed by a hospital to assist him in cutting open and

sewing up a patient, so is a physician responsible for the derelictions of persons employed by a corporation to carry out for him the clerical details that are necessary to the successful performance of his duty to render skillful care and attention to whomever he accepts as a patient.

 If Dr. Badenhausen had been an old-fashioned country doctor without any office help and had mislaid his notes on this lady's care and then put her off and forgotten her, there can be little doubt that he could have been held responsible had she died as a consequence of that neglect. Placing a layer of other people, by whomsoever they may be employed, between a physician and his patient does not alter the situation, because the physician's professional duties are not susceptible of being delegated or diffused.

There was conflicting testimony about appointments made for Mrs. Boyd and not kept by her, from which it is argued that she was contributorily negligent. Demonstrably, we think, that question is for a jury to decide.

The judgment is reversed with directions for further proceedings consistent with this opinion.

All concur.